# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

IN THE MATTER OF THE )
CONTENTS OF (1) KEYBANK )
ACCOUNT NO. 720121030160; (2) )     CASE NO. ___3:21-mj-00233-MMS___
KEYBANK ACCOUNT NO. )
720121030004; (3) KEYBANK )
ACCOUNT NO. 720121030525, )
AND (4) NORTHRIM BANK )
ACCOUNT NO. 3170321542, UP )
TO $1,010,404.00 )          Apr 20 2021

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEIZURE WARRANT

I, Andrew K. McKay, being first duly sworn, hereby depose and state as follows:

### AGENT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States, within the

meaning of Title 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of

and to make arrests for offenses enumerated in Title 18 U.S.C. § 2516. I have been a Special

Agent with the Federal Bureau of Investigation (FBI) since August 2014. Since that time, I

have been assigned investigative responsibilities in the areas of counterintelligence, cyber-

crime and white-collar crime. I am currently assigned to the Anchorage Field Office, where I

have been assigned to FBI Anchorage's White-Collar Squad. The Anchorage Field Office is

located within the District of Alaska. My responsibilities include the investigation of among

other offenses, wire fraud, mail fraud, bank fraud, money laundering and other frauds.

Throughout my years as an FBI Special Agent, I have conducted numerous investigations

involving the use of the internet in furtherance of criminal activity, including identity theft


Apr 20 2021

cases and fraud schemes. I have participated in the execution of multiple federal search warrants.

## SUMMARY

2.    This is an affidavit in support of a civil and criminal seizure warrant made pursuant to 18 U.S.C. §§ 981(a)(1)(A), (D), (b)(2) and 984 (civil forfeiture); and §§ 982(a)(1), (2) and (b)(1), and 21 U.S.C. § 853(f) (criminal forfeiture), to seize property constituting, or derived from, proceeds a person obtained directly or indirectly as the result of one or more violations of 18 U.S.C. § 1001 (False Statements); 18 U.S.C § 1014 (False Statements in a Loan Application); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1344 (Bank Fraud); and 21 U.S.C. §§ 1956(a)(1) and 1957 (Money Laundering); including all funds in the following four accounts (collectively, the "Accounts"), not to exceed a total of $1,010,404.00 (the "Target Funds"), and further described in Attachment A:

| Account No. | Accountholder |
|---|---|
| KeyBank Account No. 720121030160 ("KeyBank Account 0160") | IT, LLC |
| KeyBank Account No. 720121030004 ("KeyBank Account 0004") | IT, LLC |
| KeyBank Account No. 720121030525 ("KeyBank Account 0525") | Bistro IT, LLC |
| Northrim Bank Account No. 3170321542 ("Northrim Account 1542") | RB Enterprises LLC |

3.    The Target Funds held in the above-referenced Accounts are the proceeds derived from fraudulent Economic Injury Disaster Loan ("EIDL") program and the Paycheck Protection Program ("PPP") applications submitted by Bob Gross ("GROSS") on behalf of two companies he controlled: (1) IT, LLC, and (2) Bistro IT, LLC. These applications include one EIDL application and two PPP loans funded for IT, LLC, and one EIDL

Page 2 of 22

application funded for Bistro IT, LLC. The applications were fraudulent and resulted in the funding of over $1,000,000 in fraudulent proceeds. Portions of the fraudulent proceeds were transferred to RB Enterprises, another entity controlled by GROSS.

4.      This affidavit in support of a seizure warrant is based upon personal knowledge in furtherance of a joint, multi-agency investigation, including federal law enforcement officials whom I know to be reliable and trustworthy. This affidavit is intended to demonstrate only sufficient probable cause for the requested warrants and does not set forth all my personal knowledge regarding this investigation. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

5.      The information set forth below is based upon my knowledge of an investigation conducted by the FBI and other law enforcement agents and officers. I have not included each and every fact obtained pursuant to this investigation, and instead have only included facts sufficient to establish probable cause for the requested seizure warrants to issue.

//

//

//

//

# LEGAL AUTHORITY

 Apr 20 2021

## I.    Civil Forfeiture

6.    Pursuant to 18 U.S.C. § 981(a)(1)(A) and (D) (civil forfeiture), the following

property is subject to forfeiture:

> (A) Any property, real or personal, involved in a transaction or attempted
> transaction in violation of 1956, 1957 or 1960 of this title, or and property
> traceable to such property…
> (C) Any property, real or personal, which constitutes or is derived from
> proceeds traceable to a violation of any offense constituting "specified
> unlawful activity" (as defined in section 1956(c)(7) of this title), or a
> conspiracy to commit such offense…
> (D) Any property, real or personal, which represents or is traceable to the
> gross receipts obtained, directly or indirectly, from a violation of—
>> …
>> (vi) section 1343 (relating to wire fraud).

7.    A transaction or attempted transaction in violation of Title 18 U.S.C. § 1957

(Engaging in monetary transactions in property derived from specified unlawful activity),

occurs when:

> (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly
> engages or attempts to engage in a monetary transaction in criminally
> derived property of a value greater than $10,000 and is derived from
> specified unlawful activity.

8.    18 U.S.C. § 1956(c)(7) defines "specified unlawful activity" as "Any act or

activity constituting an offense listed in section 1961(1)(racketeering) of this title."

9.    18 U.S.C. § 1961 defines "racketeering activity" to include "section 1343

(relating to wire fraud)."

10.    18 U.S.C. § 981(b)(2) states that "[s]eizures pursuant to this section shall be

made pursuant to a warrant obtained in the same manner as provided for a search warrant

under the Federal Rules of Criminal Procedure.

11.     18 U.S.C. § 984 (civil forfeiture of fungible property), provides, in part:

(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals—

    (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

    (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.
(b) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

## II.     Criminal Forfeiture

12.     Pursuant to 18 §§ 982(a)(criminal forfeiture):

(1) The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.
(2) The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate— (A) section… 1343… of this title, affecting a financial institution… shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

13.     21 U.S.C. § 853(f) (warrant of seizure for criminal forfeiture) provides:

The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

## OVERVIEW OF CERTAIN CARES ACT RELIEF

14.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. 116-136, 134 Stat. 281, is a federal law enacted in or around March 2020, which was designed to provide emergency financial assistance to millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. Two sources of relief provided by the CARES Act were the EIDL program and the PPP.

15.    The EIDL program is run by the U.S. Small Business Administration ("SBA") and provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

16.    The CARES Act authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

17.    Unlike PPP loan applications, which are submitted directly to participating lenders, EIDL applications are submitted electronically to the SBA through servers in Colorado and processed by the agency with support from Rapid Finance, a third party government contracted company managing the EIDL program. The amount of an EIDL, if the approved, is determined based, in part, on information provided within the application about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL or advance are issued directly by the SBA. EIDL funds can be used for payroll


expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtains a loan under the PPP, the EIDL funds cannot be used for the same purpose as the PPP funds. The PPP was designed to provide an incentive for small businesses to keep workers on the payroll.

18.     Through the PPP, the CARES Act authorized up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses. In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

19.     In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan applications, the small business (through its authorized representative) must have stated, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must have provided documentation to the lending institution showing their payroll expenses. Typically, businesses would supply documents showing the amount of payroll taxes reported to the Internal Revenue Service ("IRS").

20.     A PPP loan application was processed by a particular lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Data from the application, including information

about the borrower, the total amount of the loan, and listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

21.     PPP loan proceeds must be used by the businesses on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expense.

## PROBABLE CAUSE

### I.     Overview of Relevant Companies

#### A.     IT, LLC

22.     On or about August 12, 2011, IT, LLC, was formed as a limited liability company in the State of Alaska with entity number 136859. GROSS was listed as the registered agent, manager, and sole member of IT, LLC. On or about July 23, 2012, a "Change of Officials" filing was submitted to the State of Alaska Department of Commerce, Community and Economic Development. This filing changed the ownership of IT, LLC, to 50% owned by RB Enterprises, LLC, 50% owned by Mystery Ranch, LLC. GROSS remained the manager. According to the documents filed with the State of Alaska, this was the organizational structure for IT, LLC, for 2020 to the present, the relevant period herein.

23.     IT, LLC, owns and operates the Inlet Tower hotel in downtown Anchorage.

#### B.     Bistro IT, LLC

24.     On or about November 2, 2011, Bistro IT, LLC, was formed as a limited liability company in the State of Alaska with entity number 10000969. GROSS was listed as the

registered agent, Mystery Ranch, LLC, was listed as 50% member/manager, and RB Enterprises, LLC, was listed as 50% member/manger. Bistro IT, LLC's 2019 tax returns also list RB Enterprises, LLC, and Mystery Ranch, LLC as the 50/50 owners. According to the documents filed with the State of Alaska, this was the organizational structure for IT, LLC for all of 2020.

25. Bistro IT, LLC's sole purpose is to hold the liquor license for the Inlet Tower Hotel. According to Bistro, LLC,'s 2019 tax returns, it has no business operations, income/expenses, or assets.

C. **RB Enterprises, LLC**

26. According to the State of Alaska Department of Commerce, Community and Economic Development, RB Enterprises, LLC, is a limited liability company 95% owned by GROSS and 5% owned by Melodie Gross, GROSS' wife.

D. **Mystery Ranch, LLC**

27. According to the State of Alaska Department of Commerce, Community and Economic Development, Mystery Ranch, LLC, is a limited liability company 50% owned by Jack Barrett and 50% owned by Dawn Barrett, Jack Barrett's wife.

E. **The Civil Litigation Between the Barretts/Mystery Ranch and GROSS/RB Enterprises**

28. On or about August 2014, the Barretts and Mystery Ranch, LLC, filed a lawsuit in the Anchorage Superior Court against GROSS and RB Enterprises, LLC, alleging, in part, bad acts and mismanagement of IT, LLC. Various civil disputes between the Barretts/Mystery Ranch and GROSS/RB Enterprises, LLC, have been ongoing since August 2014; however, the

organizational structure of IT, LLC, has remained 50% owned by RB Enterprises, LLC, 50% owned by Mystery Ranch, LLC, and managed by GROSS.

29.    On or about September 2018, per the terms of the IT, LLC, Operating Agreement, the parties' case was heard in a binding arbitration proceeding.

30.    In or about November 2018, the arbitrator found that GROSS failed to disclose partnership business information and decisions, had taken unilateral actions for his own benefit, and had made material changes to the parties operating agreement that were to the Barretts' detriment. The arbitrator specifically found that GROSS owed fiduciary duties to Mystery Ranch, LLC, and placed restrictions on GROSS' management of IT, LLC.  The arbitrator awarded Mystery Ranch, LLC, damages for RB Enterprises, LLC, not paying back its share of the loan that Mystery Ranch, LLC, made for the purchase of the hotel property. This award was reduced to a judgment.  The arbitrator also awarded Mystery Ranch, LLC for its attorney's fees.  The arbitrator further ordered that if RB Enterprises, LLC did not pay the judgment, which amounted to approximately $380,000, within 270 days, Mystery Ranch, LLC would be entitled to execute on 100% of RB Enterprise LLC's interest in IT, LLC.

31.    From on or about December 31, 2019, to on or about June 3, 2020, GROSS made three payments into the State of Alaska Court Registry to satisfy the approximately $380,000 judgement.  Barrett disputed the source of GROSS's payments, asserting the funds used by GROSS were "tainted funds" misappropriated from IT, LLC.

32.    On or about December 1, 2020, Judge Gregory Miller of the Superior Court for the State of Alaska, ruled the approximately $380,000 funds deposited in the Court Registry by GROSS to be "tainted".  Judge Miller ordered GROSS/RB Enterprises to pay the full

arbitration award of approximately $380,000 in untainted funds by March 2, 2021. If GROSS/RB Enterprises did not make payment in full by that date, BARRETT/Mystery Ranch could then make an expedited request to transfer 100% of RB Enterprise's 50% interest in IT, LLC to Mystery Ranch.

33.     On March 1, 2021, RB Enterprises filed for Chapter 11 bankruptcy protection. In connection with that bankruptcy, Gross stated that RB Enterprises has a 50/50 interest with Mystery Ranch in IT, LLC. That bankruptcy case is pending.

## II.     The Fraudulent PPP and EIDL

### A.     PPP Loan No. 1 to IT, LLC

34.     On or about April 2, 2020, GROSS prepared an application for a PPP loan to IT, LLC, in the requested amount of $250,000.00.

35.     On or about April 2, 2020, GROSS, from his email address bob.gross@inlettower.com, emailed Barrett requesting that Barrett (via Mystery Ranch, the 50% owner of IT, LLC) approve and sign the PPP loan application. The email was titled "Paycheck Protection Program." In the email, GROSS stated his intention to file an application for a PPP loan on behalf of IT, LLC, and instructed Mystery Ranch to approve and sign the PPP loan application. Attached to the email was a draft PPP loan application disclosing that IT, LLC, was owned 50/50 by RB Enterprises (GROSS) and Mystery Ranch, LLC (the Barretts).

**Paycheck Protection Program**
**Application Form**

| Non-Profit ☐ Vet Org ☐ Tribal ☐ Ind. Cont. ☐ Self Employed ☐ | | | DBA or Tradename if applicable | |
| --- | --- | --- | --- | --- |
| Business Legal Name | | | Inlet Tower Hotel | |
| IT LLC | | | | |
| Business Primary Address | | | Business TIN (EIN/SSN) | Business Phone |
| 1020 W 12th Ave | | | 45-3151543 | 907 360-3880 |
| Anchorage, AK 99501 | | | Primary Contact | Email Address |
| | | | Bob Gross | bob.gross@inlettower.com |

| Average Monthly Payroll | $100,000 | X 2.5 equals Loan Amount | $250,000 | Number of Jobs | 55 |
| --- | --- | --- | --- | --- | --- |
| Purpose of the loan (select more than one): | ■ Payroll ☐ Rent ☐ Mortgage Interest ■ Utilities ☐ Other (explain) | | | | |

**Applicant Ownership**
List all owners of Applicant with greater than 20% ownership stakes. Attach a separate sheet if necessary.

| Owner Name | Title | Ownership % | TIN (EIN/SSN) | Address |
| --- | --- | --- | --- | --- |
| RB Enterprises LLC | Member | 50% | 27-0238969 | 205 E Dimond Blvd Anchorage, AK 99515 |
| Mystery Ranch LLC | Member | 50% | 38-3840456 | 1900 Arctic Blvd #131 Anchorage, AK 99503 |

36.    On or about April 3, 2020, Barrett wrote to GROSS requesting additional information before approving the loan request.

37.    On or about April 4, 2020, despite Barrett requesting more information about the loan, GROSS circumvented Barrett's approval by modifying the PPP loan application.  In particular, GROSS altered the loan application by eliminating Mystery Ranch as a 50% owner of IT, LLC, and falsely claiming that his entity, RB Enterprises, LLC, was the 100% owner.

//

//

//

//

//

//

//

DocuSign Envelope ID: 949AC611-3C3F-43D7-9AA2-D07D6BB1F703

<table>
<tr><td colspan="2" rowspan="2"></td><td colspan="2">**Paycheck Protection Program**<br>**Borrower Application Form**</td><td colspan="2">OMB Control No.: 3245-0407<br>Expiration Date: 09/30/2020</td></tr>
<tr></tr>
<tr><td>**Check One:**</td><td colspan="3">☐ Sole proprietor  ☐ Partnership  ☐ C-Corp  ☐ S-Corp  ☒ LLC<br>☐ Independent contractor  ☐ Eligible self-employed individual<br>☐ 501(c)(3) nonprofit  ☐ 501(c)(19) veterans organization<br>☐ Tribal business (sec. 31(b)(2)(C) of Small Business Act)  ☐ Other</td><td colspan="2">**DBA or Tradename if Applicable**<br><br>IT LLC</td></tr>
<tr><td colspan="4">**Business Legal Name**</td><td colspan="2"></td></tr>
<tr><td colspan="4">IT LLC</td><td colspan="2"></td></tr>
<tr><td colspan="4">**Business Address**</td><td>**Business TIN (EIN, SSN)**</td><td>**Business Phone**</td></tr>
<tr><td colspan="4" rowspan="3">1020 W 12th Ave, , Anchorage, Alaska 99501</td><td>453151543</td><td>(907) 360-1260</td></tr>
<tr><td>**Primary Contact**</td><td>**Email Address**</td></tr>
<tr><td>Robert Gross</td><td>bobgross@alaskan.com</td></tr>
<tr><td>Average Monthly Payroll:</td><td>$ 116734</td><td colspan="2">x 2.5 + EIDL, Net of<br>Advance (if Applicable)<br>Equals Loan Request:</td><td>$ 291835</td><td>Number of Employees: 55</td></tr>
<tr><td colspan="2">Purpose of the loan<br>(select more than one):</td><td colspan="4">☒ Payroll  ☐ Lease / Mortgage Interest  ☐ Utilities  ☐ Other (explain): _____</td></tr>
</table>

**Applicant Ownership**

List all owners of 20% or more of the equity of the Applicant. Attach a separate sheet if necessary.

| Owner Name | Title | Ownership % | TIN (EIN, SSN) | Address |
|---|---|---|---|---|
| Robert Allen Gross | Managing Member | 100 | 574285783 | 1020 W 12th Ave, |
| | | | | Anchorage, Alaska, 99501 |

38.     In addition to the false statement about the ownership of IT, LLC, GROSS falsely claimed that he did not own any other business when, in truth, GROSS, according to records from the State of Alaska, is the owner of multiple other businesses.

39.     The aforementioned false statements were material to the PPP loan application because, according to a Deputy Associate Administrator for the Office of Capital Access, Small Business Administration, the lending bank was deprived of the opportunity to review for program integrity the financing eligibility under SBA program requirements in which the applications would have been potentially ineligible for approval under SBA guarantees. Further, the applications falsely certified to the lending bank that the applicants were eligible for the loans, and, therefore, the SBA provided a guarantee to the lending bank that it otherwise would not have provided.

40.     Based on my training and experience, I believe that the lending bank would not have submitted the loan application to SBA if the lending bank had known that the loan application contained false information.

41.     On or about April 4, 2020, GROSS electronically signed and submitted the fraudulent loan application in the amount of $291,835.00 to the SBA.

42.     On the "Paycheck Protection Program Borrower Application", GROSS digitally initialed the following statement on or about April 4, 2020:

> "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

43.     On or about April 6, 2020, Barrett, unaware that GROSS had already submitted the PPP loan application with the fraudulent representations, wrote to GROSS requesting additional information before approving the loan request.

44.     On or about April 7, 2020, despite having already submitted the PPP loan application on behalf of IT, LLC, GROSS wrote to Barrett again urging Barrett to approve the loan application. GROSS, however, did not disclose that he had already signed and submitted the fraudulent loan application.

45.     On or about April 8, 2020, the Barrett emailed GROSS stating that they would not approve of the loan application because, inter alia, "[w]e will not commit perjury by making certifications we cannot verify or support."

46.     Notwithstanding the foregoing and still unknown to Barrett, on or about April

21, 2020, GROSS signed an agreement with KeyBank (the designated bank for the loan) for

PPP Loan No. 371198771-04 in the amount of $291,835 for IT, LLC.

47.     On or about April 23, 2020, the $291,835 PPP loan was deposited into IT,

LLC's KeyBank Account 0160. According to bank records, GROSS controls KeyBank

Account 0160.

48.     Based on my training and experience, I believe GROSS knowingly falsified the

"Applicant Ownership" section on the "Payroll Protection Program Borrower Application

Form" because he knew that IT, LLC, would not be issued the PPP loan without the

certification of Mystery Ranch, LLC. I further submit that, based on my experience, training,

and information from the SBA, the loan would not have been made if the SBA and KeyBank

knew the truth about the false statements.

**B.     EIDL to IT, LLC**

49.     On or about March 30, 2020, GROSS prepared an online application for an

EIDL in the amount of $150,000.00 on behalf of IT, LLC. The application for the EIDL was

submitted through a Rapid Intake Review online process, an online application process

created by Rapid Finance, a third-party government contracted company managing the

administration of the EIDL program on behalf of the SBA. The application identifies

GROSS as the person who completed the form.

50.     In the EIDL application, GROSS omitted any reference to Barrett/Mystery

Ranch and again falsely stated he was 100% owner of IT, LLC. Barrett was not aware of the

EIDL application.

51.     The false statement was material to the EIDL application because, according to a Deputy Associate Administrator for the Office of Capital Access, Small Business Administration, the SBA was deprived of the opportunity to review for program integrity the financing eligibility under SBA program requirements in which the applications would have been potentially ineligible for approval under SBA guarantees.

52.     Based on my training and experience, I believe that the SBA would not have approved the loan application if the SBA had known that the loan application contained false information

53.     On or about June 9, 2020, GROSS electronically signed and submitted the EIDL application.  The application was signed by "bob Gross" with an associated email address of bob.gross@inlettower.com.

54.     In connection with the application, GROSS additionally electronically signed a "Loan Authorization and Agreement" and "Note" for $150,000 with the SBA for an EIDL for IT, LLC.

55.     On or about April 21, 2020, a $10,000 advance was deposited in IT, LLC's KeyBank Account 0004 controlled by GROSS.

56.     On or about July 1, 2020, $149,900 EIDL was deposited in KeyBank Account 0004.

57.     Based on my training and experience, I believe GROSS knowingly falsified his ownership interest in IT, LLC, on the EIDL application because of his long-standing dispute with Mystery Ranch, LLC, in part, to conceal the loan and EIDL funds from the Barretts and Mystery Ranch, LLC.  I further submit that, based on my experience, training, and

information from the SBA, the loan would not have been made if the SBA knew the truth about the false statements.

### C.    EIDL to Bistro IT, LLC

58.    On or about April 14, 2020, GROSS prepared an online application for an EIDL in the amount of $150,000.00 on behalf of Bistro IT, LLC.  The EIDL application was submitted through the RAPID Intake Review online process.  The application identifies GROSS as the person who completed the form.

59.    The EIDL application states that Bistro, IT, LLC, had: (1) $1,079,785 in gross revenues for the twelve months prior to the date of the disaster (January 31, 2020), (2) $367,164 in cost of goods sold for the twelve months prior to the date of the disaster (January 31, 2020), and (3) had ten employees as of January 31, 2020.

60.    These statements, however, were false.  According to Bistro IT, LLC's 2019 tax return, signed by Bob GROSS on or about September 15, 2020, Bistro IT, LLC had no expenses or income for 2019.   According to documents and witness statements, all food and beverage revenues, expenses and employee wages from Inlet PubHouse, the restaurant located inside the Inlet Tower, are reported as IT, LLC income and expenses, not Bistro IT, LLC.

61.    Moreover, in an email authored by GROSS dated September 10, 2020, GROSS confirmed that "Bistro IT LLC had no income or expense in 2019 to report on the 2019 tax return.  All revenues and expenses flowed through to IT LLC and are covered in IT LLC's 2019 P&L."

Apr 20 2021

| | |
|---|---|
| **From:** | Bob Gross |
| **Sent:** | Thursday, September 10, 2020 10:29 AM |
| **To:** | Vaughn Fowler (vaughn@bandhcpas.com) |
| **Subject:** | Bistro IT LLC - 2019 Tax Return |

Good Morning Vaughn,

Bistro IT LLC had no income or expense in 2019 to report on the 2019 tax return. All revenues and expenses flowed trough to IT LLC and are covered in IT LLC's 2019 P&L.

Regards, Bob

Bob.Gross@InletTower.com

62.     These statements were material because according to a Deputy Associate Administrator for the Office of Capital Access, Small Business Administration, the SBA was deprived of the opportunity to review for program integrity the financing eligibility under SBA program requirements in which the applications would have been potentially ineligible for approval under SBA guarantees.

63.     Based on my training and experience, I believe that the SBA would not have approved the loan application if the SBA had known that the loan application contained false information.

64.     On or about July 20, 2020, GROSS electronically signed a "Loan Authorization and Agreement" and Note for SBA Loan No. 9881177805 in the amount $150,000 with the SBA for an EIDL for Bistro IT, LLC. The application was signed by "Bob Gross" with an associated email address of bobgross@alaskan.com. Barrett was not aware of the EIDL application.

65.     On or about September 4, 2020, the $149,900 EIDL was deposited in Bistro IT, LLC's KeyBank Account 0525 controlled by GROSS.

Apr 20 2021

66.     Based on my training and experience, I believe GROSS knowingly falsified the revenues, expenses and number of employees on the Bistro IT, LLC EIDL application because of his long-standing dispute with Mystery Ranch, LLC, in part, to conceal the loan and EIDL funds from the Barretts and Mystery Ranch, LLC. I further submit that, based on my experience, training, and information from the SBA, the loan would not have been made if the SBA knew the truth about the false statements.

67.     In addition, Gross opened Bistro IT LLC's KeyBank Account 0525 in or about June 2020. Over the next eight (8) months, there were only twelve (12) transactions in the account, including the $149,900 EIDL deposit on September 4, 2020. In January and February 2021, over $139,000 of Bistro IT, LLC's EIDL funds were transferred to IT, LLC's KeyBank Account 0004.

68.     In February 2021, GROSS used substantially all the remaining Bistro IT, LLC EIDL funds to purchase an official check payable to "cash." The check, in the amount of $10,000, was endorsed for deposit to an account ending 1542 and was negotiated through Northrim Bank (*i.e.*, Northrim Account 1542). Bankruptcy documentation of RB Enterprises LLC indicates that RB Enterprises LLC owns Northrim Account 1542.

**D.     PPP Loan No. 2 to IT, LLC**

69.     On or about January 19, 2021, GROSS prepared a second draw application for a PPP loan to IT, LLC, in the requested amount of $408,569.00.

70.     GROSS again falsely represented that he was the sole owner of IT, LLC, and falsely represented that he had no ownership of any other businesses.

71.     The false statement was material because according to a Deputy Associate Administrator for the Office of Capital Access, Small Business Administration, the lending bank was deprived of the opportunity to review for program integrity the financing eligibility under SBA program requirements in which the applications would have been potentially ineligible for approval under SBA guarantees. Further, the applications falsely certified to the lending bank that the applicants were eligible for the loans, and, therefore, the SBA provided a guarantee to the lending bank that it otherwise would not have provided.

72.     Based on my training and experience, I believe that the lending bank would not have submitted the loan application to SBA if the lending bank had known that the loan application contained false information.

73.     GROSS electronically signed and submitted the application on January 19, 2021. Barrett was unaware of this application.

74.     Based on information obtained from the SBA, on or about March 23, 2021, $408,569 was deposited into an IT, LLC account. The specific account is not yet known, however, second round PPP loans are generally deposited into the same accounts as the first round. Consequently, the funds were likely deposited into KeyBank Account 0160.

75.     Based on my training and experience, I believe GROSS knowingly falsified the ownership information because of his long-standing dispute with Mystery Ranch, LLC, in part, to conceal the loan and PPP funds from the Barretts and Mystery Ranch, LLC. I further submit that, based on my experience, training, and information from the SBA, the loan would not have been made if the SBA and KeyBank knew the truth about the false statements.

76.     Therefore, I submit that GROSS committed multiple acts of wire fraud and money laundering and that the Target Funds are subject to forfeiture under 18 U.S.C. §§ 981(a)(1)(A), (D), (b)(2) and 984 (civil forfeiture); and §§ 982(a)(1), (2) and (b)(1), and 21 U.S.C. § 853(f) (criminal forfeiture) because the funds were obtained through a scheme to defraud and the use of an interstate wire communication was used to further the scheme and/or are the proceeds of proceeds traceable to specified unlawful activities, including wire fraud.

77.     This affidavit in support of the seizure warrant is requested to ensure the proceeds of the fraud are not utilized.

78.     In summary, the maximum amounts to be seized in each of the Accounts, in an aggregate amount not to exceed $1,010,204.00, are as follows:

| Account No. | Accountholder | Amount |
|---|---|---|
| KeyBank Account 0160 | IT, LLC | Up to $700,404 (the total amount of the first and second PPP loan to IT, LLC) |
| KeyBank Account 0004 | IT, LLC | Up to $298,900 (the EIDL advance and amount to IT, LLC, plus the $139,000 transferred from Bistro LLC) |
| KeyBank Account 0525 | Bistro IT, LLC | Up to $149,900 (the EIDL amount to Bistro, LLC) |
| Northrim Account 1542 | RB Enterprises LLC | Up to $10,000 (the amount transferred from Bistro, LLC to RB Enterprises from the EIDL) |

79.     Pursuant to grand jury subpoena returns on March 23, 2021 (except for Northrim), the amounts in the four Accounts were as follows:

| Account No. | Accountholder | Amount |
|---|---|---|
| KeyBank Account 0160 | IT, LLC | $252.25 as of February 28, 2021 |

Page 21 of 22


| KeyBank Account 0004 | IT, LLC | $107,964.15 as of February 28, 2001 |
| KeyBank Account 0525 | Bistro IT, LLC | $7,385.89 as of February 28, 2001 |
| Northrim Account 1542 | RB Enterprises LLC | $500 as of March 1, 2021 (based on RB Enterprises Bankruptcy Filings) |

## CONCLUSION

80.    Based on the foregoing, I submit that probable cause exists that the Target Funds are property constituting, or derived from, proceeds a person obtained directly or indirectly as the result of a violation of 18 U.S.C. §§ 1343 (Wire Fraud) and 1956(a)(1) and 1957 (Money Laundering).

81.    I submit there is good cause to execute this search warrant at any time of the day or night because service will involve emailing or otherwise providing the search warrant and attachment to KeyBank and Northrim Bank, which will not disrupt any residence or business regardless of when the sending occurs.

Signed: _____     Date: 4/19/2021

Andrew K. McKay, Special Agent

Subscribed and sworn pursuant to Fed.R.Crim.P. 4.1 & 41(d)(3) on: April 20, 2021

_____

U.S. MAGISTRATE JUDGE